J-S05013-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: L.P.D., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: D.L.L., MOTHER | : : : : : : : | |
| | : | No. 2844 EDA 2024 |

Appeal from the Decree Entered October 8, 2024
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s):  2023-A0043

BEFORE:   BOWES, J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BOWES, J.:                    **FILED APRIL 11, 2025**

D.L.L. ("Mother") appeals the October 8, 2024 decree that involuntarily terminated her parental rights to her biological son, L.P.D., born in June 2017. We affirm.

We gather the pertinent factual and procedural history of this matter from the certified record.  The Montgomery County Office of Children and Youth ("OCY") first became involved with this family in April 2021, when it received a referral indicating Mother was not providing L.P.D. with sufficient food and raising concerns regarding Mother's mental health.[1]  Between April

_____

[*] Former Justice specially assigned to the Superior Court.

[1]  Mother has one older daughter who is not implicated by this appeal. Nonetheless, we note that Mother does not have custody of the elder sibling, who instead resides with Mother's aunt and uncle in Audubon, Pennsylvania. *See* N.T., 11/29/23, at 108.

2021 and November 2021, OCY instituted a family service plan to address Mother's struggles with homelessness, unemployment, and L.P.D.'s ungovernable behavior. During this time, Mother resided with L.P.D. in a homeless shelter apartment in Norristown, Pennsylvania. OCY conducted several home visits at this location, which revealed L.P.D. was regularly yelling, crying for food, and engaging in disruptive behavior.

In November 2021, OCY and the Norristown Police Department received several referrals regarding L.P.D. being left alone and Mother's declining mental health. C.D. ("Father") assumed custody of L.P.D. on or about November 13, 2021, after Mother deposited the child into his care. On December 2, 2021, the juvenile court awarded Father emergency protective custody of L.P.D. Father, however, refused to cooperate with OCY and declined to provide drug screens on at least three different occasions. One week later, Father returned L.P.D. to Mother's care voluntarily. Thereafter, Father had no evident contact with L.P.D. or OCY.[2]

On January 5, 2022, the trial court granted OCY emergency protective custody of L.P.D., which was confirmed at a shelter care hearing the same day. On January 20, 2022, the court adjudicated L.P.D. dependent and established his initial placement goal as reunification with Mother with a

_____

[2] On April 6, 2023, OCY filed a petition requesting that the orphans' court involuntarily terminate Father's parental rights to L.P.D. On November 29, 2023, the orphans' court filed a decree that involuntarily terminated Father's parental rights. We discern that he did not appeal.

concurrent goal of adoption. L.P.D. was placed in a pre-adoptive foster care home with S.H. ("Foster Mother"), where he has remained during these proceedings. *See* N.T., 11/29/23, at 48, 53. L.P.D. has been diagnosed with attention deficit disorder and receives a variety of services at school. *Id*. at 52. L.P.D. was represented by a court-appointed guardian *ad litem* ("GAL"), Lara Kash, Esquire, throughout the dependency proceedings.

In furtherance of reunification, Mother was ordered to undergo a psychological evaluation and follow the resulting recommendations, obtain stable housing, and continue working on her family service plan objectives, which included keeping steady employment and learning about nutrition, basic parenting skills, and appropriate disciplinary methods. *Id*. at 13, 35, 66-67. Mother was also offered supervised visits with L.P.D. for one hour every week. Between April 2022 and April 2023, the court held regular permanency review hearings. At every such proceeding, it found that Mother was in minimal compliance and had made no progress concerning her court-ordered objectives. During this same period, Mother participated in just fourteen of sixty-eighty potential supervised visits with L.P.D. *Id*. at 23. The court eventually reduced Mother's visits to one hour every other week in April 2023. *Id*. at 28-29. Thereafter, Mother began attending the supervised visits more regularly. *Id*. at 48.

Meanwhile, on March 31, 2023, OCY filed a petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2),

(8), and (b). The orphans' court reappointed Attorney Kash to serve as L.P.D.'s legal counsel during the termination proceedings. On November 1, 2023, OCY filed an amended petition that narrowed the grounds alleged by for termination purposes to § 2511(a)(1), (8), and (b). The orphans' court held a termination hearing later that month. As of that proceeding, L.P.D. was six years old and had been in placement for nearly twenty-three months. At the hearing, the agency adduced testimony from OCY supervisor Andrew Orr and OCY adoption caseworker Susan Rhoads. It also introduced various documents related to L.P.D.'s dependency proceedings. Additionally, Attorney Kash reported that L.P.D. expressed a strong preference for remaining in Foster Mother's care. *Id*. at 132-33. Finally, Mother was present and testified on her own behalf.

The same day as the hearing, the orphans' court filed a final decree that involuntarily terminated Mother's parental rights. Mother timely appealed. On May 21, 2024, this Court vacated the decree after concluding the orphans' court appointed Attorney Kash to serve as L.P.D.'s dual GAL and legal counsel without first determining whether the child's best and legal interests conflicted in contravention of *In re Adoption of K.M.G.*, 240 A.3d 1218, 1233-34 (Pa. 2020) (citing 23 Pa.C.S. § 2313(a)). *See In re Adoption of L.P.D.*, 321 A.3d 971, 2024 WL 2290388 (Pa.Super. 2024) (non-precedential decision). We remanded for the court to assess whether there was a conflict in L.P.D.'s

interests and, if not, to re-enter the termination decree. *Id*. at \*4 (citing *Interest of A.J.R.O.*, 270 A.3d 563, 571 (Pa.Super. 2022)).

The orphans' court held a hearing regarding potential conflicts in L.P.D.'s respective interests and issued a supplemental finding that there was no conflict in L.P.D's legal or best interests that precluded Attorney Kash from dually representing him. *See* Pa.R.A.P. 1925(a) Opinion, 11/7/24, at 1. On October 8, 2024, the orphans' court re-entered a termination decree as to Mother.

Mother filed a timely notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The orphans' court submitted a Rule 1925(a)(2)(ii) opinion that referred to the on-the-record reasoning it had previously articulated at the conclusion of the November 29, 2023 hearing. Mother presents the following issues for our review:[3]

1. Whether there is sufficient evidence to support the findings of th[e orphans'] court that the agency proved by clear and convincing evidence the requirements of 23 Pa.C.S. § 2511(a)(1) for the involuntary termination of . . . Mother's parental rights?

2. Whether there is sufficient evidence to support the findings of th[e orphans'] court that the agency proved by clear and convincing evidence the requirements of 23 Pa.C.S. § 2511(a)(8) for the involuntary termination of . . . Mother's parental rights?

_____

[3] We note with displeasure that neither OCY nor Attorney Kash have filed a brief in this appeal.

3. Whether th[e orphans'] court abused its discretion in finding that the developmental, physical and emotional needs and welfare of L.P.D. will be best served by the termination of . . . Mother's parental rights pursuant to 23 Pa.C.S. § 2511(b), when there is a strong and loving bond between . . . Mother and the child, and severance of that bond will cause irreparable harm to the child?

Mother's brief at 4 (citations and some capitalization altered).

Our standard and scope of review for these sufficiency challenges is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

***Interest of M.E.***, 283 A.3d 820, 829-30 (Pa.Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by § 2511, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. ***Id.*** at 830; ***see also*** 23 Pa.C.S. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to § 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013). It is well-established that this Court need only agree with the court's determination as to any one subsection of § 2511(a), in addition to § 2511(b), in order to affirm. ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

Based upon our review of the certified record, our analysis in this case implicates § 2511(a)(8) and (b), which provide as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . . .

> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

In order to satisfy § 2511(a)(8), the petitioner must prove that: (1) the child has been removed from the parent's care for at least twelve months; (2) the conditions which led to the removal or placement still exist; and (3) termination of parental rights would best serve the needs and welfare of the child. *See **In re Adoption of J.N.M.**,* 177 A.3d 937, 943 (Pa.Super. 2018). Section 2511(a)(8) does not necessitate an evaluation of a parent's willingness or ability to remedy the conditions that led to the removal of the child. *See **In re M.A.B.**,* 166 A.3d 434, 446 (Pa.Super. 2017). Rather, our inquiry is focused upon whether the at-issue "conditions" have been "remedied" such that "reunification of parent and child is **imminent** at the time of the hearing." ***In re I.J.***, 972 A.2d 5, 11 (Pa.Super. 2009) (emphasis added). It is axiomatic that "a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. We cannot and will not subordinate indefinitely a child's need

for permanence and stability to a parent's claims of progress and hope for the future." ***Id***. at 11-12 (internal citations and quotation marks omitted).

Finally, this Court has also explained that,

> while both [§] 2511(a)(8) and [§] 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to [§] 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by [§] 2511(b); as such, they are distinct in that we must address [§] 2511(a) before reaching [§] 2511(b).

***In re Adoption of C.L.G.***, 956 A.2d 999, 1009 (Pa.Super. 2008) (*en banc*).

We begin our review by observing that there is no dispute that the first factor of § 2511(a)(8) has been established.  As noted above, L.P.D. was removed from Mother's care and placed in the emergency custody of OCY on January 5, 2022.  Therefore, at the time OCY filed the initial petition on March 31, 2023, L.P.D. had already been removed from Mother's care for nearly fifteen months, and by the filing of the amended petition in November, he had been out of her care for over twenty-two months.

With respect to the second element of § 2511(a)(8), the orphans' court found that most of the conditions that led to L.P.D.'s removal from Mother's custody continued to exist at the time of the termination hearing.  ***See*** N.T., 11/29/23, at 146 ("I will commend mom for addressing her mental health and taking care of her mental health, which was certainly one piece, **but there are so many other pieces in this case that needed to be met**.") (emphasis added).  In her brief, Mother argues that she "did remedy the conditions that caused placement."  Mother's brief at 14.

Contrary to Mother's arguments, the certified record clearly supports the finding of the orphans' court that Mother had not remedied the conditions that led to L.P.D.'s removal such that their reunification was "imminent" at the time of the termination hearing. *Cf. I.J.*, 972 A.2d at 11. Mr. Orr and Ms. Rhoads testified that the conditions that precipitated L.P.D.'s removal from Mother's care included concerns regarding her (1) mental health, (2) homelessness; (3) lack of basic parenting skills, and (4) unemployment. *See* N.T., 11/29/23, at 13, 35, 66-67.

In her own words, Mother concedes she was "completely insane" and hearing voices between April 2021 and March 2023. *Id*. at 84-85, 92. During this same period, Mother was hospitalized on several different occasions in different mental health facilities. *Id*. at 20. Mother also admitted she "neglected" and "ignored" L.P.D. during this timeframe. *Id*. at 117-18.

Between March 2023 and May 2023, Mother was involuntarily committed at Norristown State Hospital. *Id*. at 20, 43-49, 89. Upon her release in May 2023, Mother underwent a psychological examination and began participating in medication management and therapy through Central Behavioral Health. *Id*. at 56-57. She has been diagnosed with major depressive disorder with anxiety, attention deficit hyperactivity disorder, post-traumatic stress disorder, and psychosis. *Id*. at 90, 112.

Although it took nearly two years for Mother to comply with her court-ordered mental health directives, we acknowledge that her mental health

condition had significantly improved at the time of the termination hearing.[4] Mother, however, still failed to achieve success with respect to the other issues related to employment, housing, and parenting.

Mr. Orr and Ms. Rhoads each testified that Mother was unemployed throughout these proceedings. *Id*. at 35, 49. At the time of the termination hearing, Mother had still not secured stable employment. Specifically, Mother explained that she currently works a "part-time cleaning job" that is "under the table," while also appealing a denial for disability income through Social Security. *Id*. at 88, 93-95, 109.

As detailed above, Mother has also largely been homeless and relying upon charitable housing throughout these proceedings. Following Mother's release from Norristown State Hospital, Ms. Rhoads testified that Mother began living in a room at a boarding house in Norristown, where she remained

_____

[4] In evaluating § 2511(a)(8), we acknowledge that § 2511(b) precludes the consideration of "any efforts by the parent to remedy the conditions" that "are first initiated subsequent to the giving of notice of the filing of the petition." OCY's initial petition was filed and served on March 31, 2023. As noted above, however, the agency subsequently filed and served an amended petition on November 1, 2023. Accordingly, we are not precluded from considering Mother's efforts up until November 1, 2023. *See In re A.J.C.*, 955 EDA 2019, 2019 WL 5095782, at *8 (Pa.Super. 2019) (non-precedential decision) (holding when a petitioner files an amended petition in a termination of parental rights case "the original petition is superseded and rendered a virtual nullity") (citing *Brooks v. B & R Touring Co.*, 939 A.2d 398, 402 (Pa.Super. 2007)); *see also Interest of J.R.C.*, ____ A.3d ____, 2025 WL 548386, at *5 n.6 (Pa.Super. 2025) (non-precedential decision) (observing that § 2511(b) applies to the date of service of an amended termination of parental rights petition).

at the time of the termination hearing in November 2023. *Id*. at 49, 65. Mother conceded that these lodgings were not appropriate for L.P.D. *Id*. at 114 ("It's not suitable for a child."). As a consequence of her lack of stable employment, Mother is unable to pay for this room herself and relies upon L.P.D.'s maternal grandmother to pay "most" of the rent. *Id*. at 93-94. Overall, Mother was unable to identify any non-speculative prospects for better housing in the immediate future.[5]

Finally, Ms. Rhoads testified that Mother began asking for information regarding parenting programs in October 2023, *i.e.*, one month before the termination hearing was held. *Id*. at 66-67. Mother testified that, thereafter, she began attending these parenting classes "every week" at her local library. *Id*. at 88, 96-97. Thus, we discern that Mother began attending parenting classes just one month prior to the termination hearing in this matter. There is no information in the record regarding her progress in acquiring the necessary knowledge and skills related to, *inter alia*, nutrition and discipline.

_____

[5] Mother claimed that she had secured housing through a religious program for women and children called God's Treasure House Ministry. *See* N.T., 11/29/23, at 94, 102, 106-07. Her testimony, however, indicated that this program was not active at the time of the termination hearing and was in the process of relocating. *Id*. at 94. Mother further explained that she would be required to complete an eighteen-month program in order to secure an apartment through the ministry. *Id*. at 107. She averred that, at the earliest, the program would be open for enrollment in January 2024. *Id*. at 94. Mother also confirmed she did not have a "guaranteed admission," but had merely texted with the program's administrator. *Id*. at 118.

Based upon the foregoing evidence, we observe no abuse of discretion or error of law in the findings of the orphans' court with respect to the second factor of § 2511(a)(8). Contrary to Mother's arguments, it is clear that the conditions that led to L.P.D.'s removal from her care, specifically her lack of appropriate housing, employment, and parenting abilities, continued to exist.

We now turn to the third and final element of § 2511(a)(8), which concerns whether termination of Mother's parental rights would best serve L.P.D.'s needs and welfare. The orphans' court found that Mother's desire to "start over" following her release from commitment was "insufficient to meet L.P.D.'s needs for consistent and reliable love, affection, and responsibility." *Id*. at 148. Based upon our review, we must agree.

As detailed above, L.P.D. was suffering from significant behavioral problems when OCY first became involved with this family. Specifically, Mr. Orr testified that L.P.D.'s behavior was hyperactive, obstinate, and violent. *Id*. at 36. Mr. Orr explained that while L.P.D. remained in Mother's care, the Montgomery County Early Intervention Intermediate Unit had recommended that he receive behavioral, speech, and occupational therapy. *Id*. at 15-16. Mother, however, refused to allow L.P.D. to receive any such services. *Id*. Indeed, even at the termination hearing, Mother continued to refuse to acknowledge that L.P.D. needed any type of similar support services. *Id*. at 107 ("When I see my child, he doesn't look like a child that needs therapy. . . . I have no awareness of these needs[.]"). Mr. Orr attested that, following

L.P.D.'s removal and placement with Foster Mother, he began receiving these recommended therapies. *Id*. at 36.

Mr. Orr and Ms. Rhoads each observed that L.P.D. had undergone a significant improvement in his behavior since being placed with Foster Mother and beginning treatment. Mr. Orr described him as a "calm child" now, who has experienced a "big change." *Id*. at 36. Ms. Rhoads testified similarly, explaining: "He's doing better as far as calling out in the classroom and staying in his seat and not being as disruptive as he used to be." *Id*. at 54. Finally, Ms. Rhoads noted that L.P.D. continues to receive speech, occupational, and counseling services at school. *Id*. at 53.

The record reveals that Foster Mother has served as L.P.D.'s educational decisionmaker since April 2022. *Id*. at 72-73. Mr. Orr and Ms. Rhoads each testified that Mother has not been involved with L.P.D.'s schooling for the lifetime of this case. *Id*. at 38-39. More pointedly, Ms. Rhoads also stated that Mother has played no role with respect to L.P.D.'s medical needs, nor does Mother attend the child's therapeutic appointments. *Id*. at 54. Overall, Ms. Rhoads offered that Foster Mother is taking excellent care of L.P.D. and ensures that he receives the services and support that he needs. *Id*. at 52-53. Mr. Orr also testified that L.P.D. was generally thriving in Foster Mother's care. *Id*. at 36.

Based upon this evidence, we discern no abuse of discretion or error of law in the conclusion of the orphans' court that L.P.D.'s needs and welfare

would be best served by terminating Mother's parental rights. Instantly, it is clear that L.P.D.'s quality of life and mental health have significantly improved since his removal from Mother's care. Thus, we agree that termination was warranted pursuant to § 2511(a)(8).

Since the record supports the court's conclusion that adequate grounds for termination existed pursuant to at least one subsection of § 2511(a), we now turn to a review of the court's findings pursuant to § 2511(b), which gives "primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b); *see also T.S.M.*, 71 A.3d at 267. We remain mindful that "the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis," with an eye towards "each child's specific needs." *Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023). This inquiry is neither formulaic, nor mechanical. *Id*.

Our review must include consideration of the bond between the parent and the child. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993). Our Supreme Court has explained, however, that "only a necessary and beneficial" parental bond should be maintained. *K.T.*, 296 A.3d at 1009. A bond is considered "necessary and beneficial" if its severance would cause extreme emotional consequences or significant, irreparable harm. *Id*. at 1109-10. The extent of the "bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super.

2010) (cleaned up). Therefore, it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents. *M.E.*, 283 A.3d at 839 (cleaned up). Courts should also consider "whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *K.T.*, 296 A.3d at 1106. Finally, we also note that a child's "emotional needs and welfare include intangibles, such as love, comfort, security, and stability." *Id*.

Here, the orphans' court found that "there is no parental bond" between Mother and L.P.D., while concluding that there was a "strong" parental bond between L.P.D. and Foster Mother. *See* N.T., 11/29/23, at 135. Although Mother claimed to share a strong bond with L.P.D., the only corroboration was Ms. Rhoads's testimony that L.P.D. "enjoys seeing" Mother during their supervised visits. *Id*. at 102, 127. Assuming, *arguendo*, that L.P.D. and Mother share some manner of bond, the certified record supports the finding of the orphans' court that L.P.D.'s parental bond was with Foster Mother.

Mr. Orr reported that L.P.D. was strongly and closely bonded to Foster Mother. *Id*. at 36. Ms. Rhoads testified along very similar lines regarding L.P.D.'s connection with Foster Mother: "He's very connected to her. He's always – when he's not around her, he's always looking for, always asking for her. He's very attached to her." *Id*. at 52. Ms. Rhoads explained that L.P.D. views Foster Mother as his "mommy," even when interacting with Mother. *Id*. at 127-28. In particular, Ms. Rhoads averred that L.P.D. was "very anxious"

regarding Foster Mother's absence during his supervised visits with Mother. *Id*. at 73. Finally, Ms. Rhoads testified that L.P.D. also attends "family events" with Foster Mother's extended family and "goes on vacations" with her. *Id*. at 55. This testimony was further buttressed by Attorney Kash's report to the court regarding L.P.D.'s preferences, wherein she stated that L.P.D. had expressed a strong preference for remaining with Foster Mother:

> He said that the place that he was living was his home, and that he understood [Foster Mother] to be the person who takes care of him and to be his mommy. She's also the person who spends his special days with him, holidays, vacation, after school time. She's the person that he spends his special time with.
>
> When we talked about his home and if he wanted his current home to be his forever home, he said yes, and that he loved this place and that he wanted things to stay exactly the way they are.

N.T., 11/29/23, at 132-33. By contrast, Attorney Kash indicated that L.P.D. "appeared to be a bit confused" when asked about his relationship with Mother. *Id*. at 133. He recognized that they had "visits in the big building" but "had no recollection of any phone calls or conversations or any other contact with her[.]" *Id*.

Based upon the foregoing, we find no abuse of discretion or error of law in the court's conclusions with respect to the lack of a necessary and beneficial bond between L.P.D. and Mother. Furthermore, viewing this evidence in conjunction with the discussion of L.P.D.'s behavioral improvements since leaving Mother's care set forth in our analysis of § 2511(a)(8), we readily

conclude that the findings of the orphans' court as to § 2511(b) are supported by competent evidence.

Accordingly, we affirm the termination decree.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/11/2025